**EMERY WORLDWIDE AIRLINES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–173C.

United States Court of Federal Claims.

Aug. 25, 2000.

W. Stanfield Johnson, Washington, D.C., attorney of record for plaintiff.

Kyle E. Chadwick, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION ON DEFENDANT'S MOTION TO DISMISS AND THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

Plaintiff, Emery Worldwide Airlines, Inc. ("Emery"), contracted with the United States Postal Service ("USPS" or "defendant"), in April of 1997, to operate a nationwide network for mail delivery under defendant's Priority Mail service program. Due to a multiplicity of reasons, plaintiff and defendant renegotiated a number of the contract terms, the most important of which concerns plaintiff's pricing model or compensation. Emery's April 3, 2000 six count complaint, as amended on May 22, 2000, requests declaratory relief which would have the effect of forcing defendant to comply with the August 4, 1998 renegotiated pricing terms of

the contract or, alternatively, allowing plaintiff to cease performance. Emery's complaint requests solely equitable relief and is not, at this time, seeking damages.

Defendant, by its April 10, 2000 motions, requests that the court dismiss Counts I, II, and V of plaintiff's complaint because they are moot and Counts III and IV for prudential reasons. Additionally, defendant requests summary judgment on Count VI, which is that the court order plaintiff to continue performance of the contract. At the present time, plaintiff is still performing the contract under which it alleges it is operating at a loss. Plaintiff has requested, by its cross-motion for summary judgment dated May 11, 2000, that the court grant all its requests for declaratory relief as a matter of law or allow it to cease performance. For the reasons stated herein, the court denies defendant's entire motion to dismiss and grants defendant's motion for summary judgment as to Count VI. Additionally, the court grants Emery's motion for summary judgment on Counts I—V, inclusively.

## FACTS AND PROCEDURAL HISTORY

In April of 1997, USPS selected Emery to create and operate a two-day network for a portion of its Priority Mail service under Contract No. 102590–97–B–1460 ("the contract"), whereby Emery agreed to sort and transport this classification of mail. Under the contract, Emery employs a network of ten Priority Mail processing centers, sorting and then delivering the mail to the appropriate USPS destination facilities. According to Emery, and not disputed by defendant, service performance by Emery, on mail originating and arriving within Emery's network, has been better than USPS's performance concerning Priority Mail outside the network.

Under the original contract terms, USPS agreed to pay Emery a per piece price, so long as the actual volume of mail handled remained between 95% and 105% of the volume estimates outlined in the contract and provided by USPS. The estimates were also categorized by the type of Priority Mail, which indicated what mix of mail Emery would expect to receive from USPS. As per the contract, if the volume fluctuates above or below the aforementioned percentage estimates, adjustments to the per piece price would be made according to schedules listed in the contract. This pricing structure is commonly known as "volume variation pricing" and is termed in the contract as Contract Line Item 1 (hereinafter referred to as "CLIN 1"). Emery claims to have substantially relied on USPS projections in its preparation and implementation of the system which would fulfill its obligations under the contract.

The contract contains USPS's standard disputes clause, which subjects it to the Contract Disputes Act of 1978 ("CDA"). 41 U.S.C. §§ 601–13. This clause specifies that Emery "must proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract ...." (First Amended Complaint, App. 4). The issue of continued performance is hotly contested by the parties.

Emery began execution of the contract shortly after April, 1997. According to plaintiff and undisputed by defendant, Emery, on executing the contract, has been required to process volumes of mail that consistently and substantially exceed the USPS projections as set out in the contract. Additionally, the mix of mail Emery has had to process has been significantly different from that which was projected by USPS in the contract. As such, Emery claims that it has been losing a substantial amount of money and is, in fact, executing the contract at a loss. As a result, in "early 1998," Emery informed USPS that it was preparing claims against it for the significant cost increases, which it estimates to be in the "hundreds of millions." *Id.* at 7.

Consequently, by letter agreement on August 4, 1998, and as modified by a supplemental agreement dated September 16, 1998 (hereinafter referred to *in toto* as the "August 4 agreement"), Emery and USPS modified certain terms of the contract in an attempt to obviate the parties' disagreements over the pricing structure. For specific concessions made by Emery, USPS agreed to alter the volume variation pricing of CLIN 1. The August 4 agreement provided that the parties would *attempt in good faith* to agree

upon a revised, fixed price for CLIN 1 for calendar 1999 and beyond. During the latter half of 1998 and ostensibly beyond, USPS agreed to pay Emery an increased per-piece price and a provisional rate while negotiations for a fixed price are undertaken. As for timing, the agreement specified that the fixed price for 1999 *should* be set by the parties on or before March 31, 1999. The court notes that this price, at present, has still not been set.

To that end, the agreement provided, among other things, that Emery would open its books for an audit by USPS. Such audit would be done "to the extent determined necessary" by USPS and will be completed upon 45 days of receipt of all necessary financial information. *Id.* at App. 6. Emery and USPS dispute whether all necessary financial information for the audit has been provided by Emery. The August 4 agreement also provides that the fixed price for CLIN 1 will be negotiated in future years through this same process. As far as the court has been informed, the audit for 1999 has not been completed at the present time.

It is apparent from the filings that, from August 1998 to the present, the parties have been attempting to negotiate the new prices under the August 4 agreement. As specified in the August 4 agreement, Emery has timely provided USPS with its pricing proposal, specifically on February 1, 1999. Emery contends, however, that USPS has not been negotiating with it in good faith. It contends that the provisional rate, as provided for above and set by USPS, is presently significantly lower, not higher, than the rate Emery had been receiving prior to the August 4 agreement and that such is being done in bad faith.

Accordingly, because the parties had still not agreed upon the CLIN 1 fixed price, Emery submitted a claim, on September 8, 1999, for monetary relief from USPS pursuant to the CDA. Defendant concedes that, at first, it refuted the efficacy of certain provisions of the August 4 agreement, but then retracted this position in two letters, both dated March 30, 2000 ("the March 30 decision"), in the form of the USPS contracting officer's ("CO") final decision. Specifically,

USPS initially took the position that the August 4 agreement did not impose enforceable obligations on it to negotiate a new price for CLIN 1 and that, because Emery filed a CDA claim, USPS did not have to honor any of the price re-determination provisions of said agreement. Why USPS took such indefensible positions, at that posture, is a mystery to this court.

The March 30 decision acknowledged that Emery is entitled to its incurred costs allocable to CLIN 1, consistent with applicable contract terms and regulations, plus a fair and reasonable profit. Additionally, the March 30 decision indicated that the amount Emery will receive for its 1999 performance will be decided by USPS on or before December 31, 2000, a full *19 months* after the date specified in the August 4 agreement. The March 30 decision is silent as to pricing for years subsequent to 1999. Additionally, USPS issued another letter in the form of a CO's decision, dated May 16, 2000 ("the May 16 letter"), indicating that it believed the CLIN 1 pricing negotiations for the year 2000 would not be completed within the parameters set by the August 4 agreement. This letter further indicates USPS's position that Emery does not have a right to cease performance on the contract. It is apparent from these letters and the parties' filings that there is a great disparity between the two regarding the interpretation of the August 4 agreement and what obligations it imposes on them for the setting of the CLIN 1 prices.

Consequently, Emery filed its complaint for declaratory relief in this court on April 3, 2000. In said complaint, Emery requests that: (a) the provisions of the August 4 agreement are valid and enforceable; (b) the redetermination process established in the August 4 agreement has not been terminated by Emery's formal claim; (c) USPS was and remains obligated to pay Emery reasonable provisional rate increases until a redetermined rate is set by negotiation or order; (d) USPS is not entitled to recoup its prior payments of the CY 1999 provisional rate increase or to resume volume variation pricing because Emery filed a claim under the CDA; (e) USPS is not entitled to require Emery, as a condition of a negotiated CLIN

1 rate increase, to show losses or to show a relation to USPS changes to the contract; (f) USPS remains obligated to respond to CLIN 1 pricing proposals from Emery under the August 4 agreement; (g) USPS remains obligated to negotiate in good faith to complete negotiations for the CY 1999 CLIN 1 rate, and to use its best efforts to do so; (h) USPS's position and related actions, as stated in its October 8 letter and as reflected in the complaint, are material breaches; and (i) Emery may lawfully elect to cancel the contract and stop work on account of each and every one of the breaches.

Shortly after the scheduled April 11, 2000 status conference, defendant filed a document titled "Statement To Clarify Remarks At Status Conference." In this filing, defendant substantially admits the facts contained in three counts of the complaint, to wit: that the August 4 agreement is enforceable (Count I); that the August 4 agreement has a continuing effect (Count II); and that plaintiff's interpretation of the price redetermination process as outlined in the August 4 agreement is correct (Count V). Defendant's concessions, however, were limited to admitting the factual allegations in those counts, not the legal issue that defendant's actions constitute material breaches. Because the parties were attempting to fully negotiate the disputed pricing terms of the contract, they agreed, on April 27, 2000, to dismiss, without prejudice, plaintiff's request for relief which stated that defendant was in material breach (letter (h) above) and that, as such, plaintiff could elect to cease performance (letter (i) above).

These negotiations apparently failed because Emery filed its first amended complaint, on May 22, 2000, which again asserted the two previously dismissed requests. A total of six counts, to be discussed in the next sections seriatim, support Emery's requests for declaratory relief enumerated (a) through (i) above. The counts contained in the amended complaint are as follows: I) the August 4 agreement is enforceable; II) the August 4 agreement has continuing effect; III) USPS has an obligation to pay a provisional rate as per the August 4 agreement; IV) USPS's continued use of volume varia-tion pricing in contravention to the August 4 agreement is a material breach entitling plaintiff to cease performance; V) plaintiff's interpretation of the price redetermination process, as outlined by the August 4 agreement, is correct; and VI) plaintiff has a right to cease performance because of USPS's breaches and such right is not obviated by the disputes clause of the contract.

The task before this court is two-fold. First, the court will determine whether defendant is entitled to dismissal of one or more of Counts I—V in the amended complaint as a matter of law. Secondly, the court will determine if there are genuine issues of material fact which would prevent the court from rendering summary judgment for plaintiff on Counts I—V, and for either party on Count VI.

## DISCUSSION

### I. DEFENDANT'S MOTION TO DISMISS

The government seeks to dismiss, by its April 10, 2000 motion and June 9, 2000 reply brief, Counts I, II, and V of plaintiff's claim on the grounds that they are moot and, therefore, the court lacks subject matter jurisdiction pursuant to the Rules of the Court of Federal Claims ("RCFC") 12(b)(1). Additionally, defendant requests the court to decline to exercise jurisdiction on Counts III and IV because of compelling prudential reasons, also pursuant to RCFC 12(b)(1). It is important to note that defendant initially took the position, in its April 10, 2000 motion, that Count IV should be dismissed as moot. Thereafter, in its June 9, 2000 reply brief, defendant appears to have abandoned this position and, instead, added Count IV to its section alleging dismissal for prudential reasons.

Furthermore, the court notes that the opening paragraph of defendant's April 10, 2000 motion to dismiss indicates it is requesting dismissal pursuant to RCFC 12(b)(1) (lack of subject matter jurisdiction) *and* RCFC 12(b)(4) (failure to state a claim), but that its supporting arguments for dismissal are more appropriate under 12(b)(1), as no analysis under 12(b)(4) is contained therein.

Moreover, defendant's June 9, 2000 reply brief simply states that defendant is requesting dismissal pursuant to "Rule 12," without specifying a subsection. Accordingly, the court considers defendant's motion, *in toto*, as a request to dismiss Counts I, II, and V as moot, and Counts III and IV because of prudential reasons, both under Rule 12(b)(1).

■■■ Jurisdiction over the subject matter in this case is initially conferred on this court by the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. § 609(a)(1). This is so because the disputed contract issues are with the United States, and it contains a clause which provides that it is to be governed by the CDA. Under the CDA, Emery is permitted to bring this action directly in the Court of Federal Claims after the final decision by USPS's CO, dated March 30, 2000, in lieu of appealing this decision to an agency appeals board. As such, this instant action is a *de novo* proceeding and, once properly here, this court shall rule on Emery's claim as an original proceeding and not simply as a limited review of the CO's decision.

Our equity jurisdiction over this type of subject matter is a fairly recent development. That is so because, in 1992, the Tucker Act was amended to give the Court of Federal Claims jurisdiction "to render judgment upon any claim by or against ... a contractor under section 10(a)(1) of the Contract Disputes Act, including [certain specific kinds of non-monetary disputes], and other non-monetary disputes on which a decision of the contracting officer has been issued under section 6 of the [CDA]." 28 U.S.C. § 1491(a)(2), *quoted by Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1268 (Fed.Cir.1999). The instant requests for declaratory relief herein are exactly the type of "non-monetary" disputes envisioned by the 1992 amendment.

■■■ When evaluating a motion to dismiss, as in this case, the court must construe the allegations of the complaint favorably to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (abrogated on other grounds). Evaluating the complaint in this manner is required regardless of whether the motion to dismiss is one for failure to state a claim or for lack of subject matter jurisdiction, as in this case. Thus, in rendering our decision, the court will presume that all of Emery's factual allegations are true. *See Forestry Surveys and Data v. United States,* 44 Fed.Cl. 485, 490 (1999).

■■■ If, however, the motion to dismiss for lack of subject matter jurisdiction challenges the truth of the jurisdictional *facts* in the complaint, the court may look beyond the pleadings to consider all available evidence—in the instant case the parties' filings—in order to determine jurisdiction. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir. 1991). Similarly, if the court has doubts regarding jurisdiction, it may look at all the evidence presented to satisfy itself regarding the jurisdictional facts. *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed. Cir.1998). Indeed the court may, and often must, find facts on its own. This fact-finding scenario is what the court faces now in deciding this instant matter.

■■■ Subject matter jurisdiction may be challenged at any time by the parties, the court *sua sponte,* or even on appeal. *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir. 1993). The plaintiff, of course, bears the burden of establishing subject matter jurisdiction and must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir.1988). Accordingly, mindful of Emery's burden to establish the jurisdiction of this court, as well as our own duty to ensure the legitimacy of our jurisdiction, we consider all the evidence presented for this court's consideration in evaluating the government's motion to dismiss, even evidentiary matters outside of the pleadings. *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985). Indeed, if a defendant challenges jurisdiction, the plaintiff cannot rely merely on allegations in the complaint but must instead bring forth relevant, competent proof to establish jurisdiction. *Reynolds,* 846 F.2d at 747.

■■■ It is important to understand, however, that the court's task on this issue is not to

decide "whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. Therefore, after a review of the factual allegations of this instant complaint, the petition should be dismissed for lack of subject matter jurisdiction only if no set of facts contained therein would, if proved, entitle plaintiff to relief in this court. *Son Broadcasting, Inc. v. United States*, 42 Fed.Cl. 532, 537 (1998). *See also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ Defendant alleges that, because it has conceded the main factual issues of Counts I, II, and V, those counts have been rendered moot. "The mootness doctrine originates from the 'case or controversy' requirement of Article III of the United States Constitution." *CCL Service Corp. v. United States et al.*, 43 Fed.Cl. 680, 688 (1999), *citing Northrop Corp. v. United States*, 27 Fed.Cl. 795, 800 n. 4 (1993) (discussing mootness doctrine and its application by Court of Federal Claims); *see Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("[t]he judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.' "). In other words, if a plaintiff's allegations become moot for some reason, there would be no justiciable "case or controversy" a court could decide and, therefore, such court would be divested of subject matter jurisdiction. While Congress created this court under Article I of the U.S. Constitution and the "case or controversy" requirement appears in Article III, the mootness doctrine and other justiciability precepts—including ripeness and standing—have often been properly invoked by this court. *CW Government Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557–58 (2000); *see* Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 105(a), 96 Stat. 25, 27 (1982) (codified, as amended, at 28 U.S.C. § 171 (1994)).

■ "The burden of demonstrating mootness 'is a heavy one.' " *County of Los Angeles v. Davis*, 440 U.S. 625, 631–34, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), *quoting United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The mootness of an action relates to the existence of a basic dispute between the parties and not only to the declaratory relief that has been requested. Thus, although defendant's subsequent acts may possibly moot plaintiff's declaratory relief requests herein, the constitutional requirement of "a case or controversy" may be supplied by the availability of other relief if additional consequences of defendant's actions remain. *CCL Service Corp.*, 43 Fed.Cl. at 688–89.

■ Thus, USPS's voluntary cessation of illegal or breaching conduct does not necessarily moot plaintiff's related counts unless it is absolutely clear that the alleged improper behavior will not reasonably recur. In this connection, "[a] case becomes moot when there is no reasonable expectation 'that the alleged violation will recur, * * * and * * * interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.' " *National Medical Enterprises, Inc. v. United States*, 11 Cl.Ct. 329, 332 (1986), *quoting County of Los Angeles*, 440 U.S. at 631, 99 S.Ct. 1379. A defendant's voluntary cessation of a challenged practice or conduct—in this case contract breaches—does not necessarily deprive a federal court of its power to determine the legality of the practice. *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 120 S.Ct. 693, 708, 145 L.Ed.2d 610 (2000). The heavy burden of establishing to the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Id.*

■ In addition to the foregoing, defendant requests the court to dismiss Counts III and IV, even if they are not moot, because of prudential reasons, including: i) plaintiff has an adequate damages remedy; ii) the court should decline to unnecessarily interfere with an existing contract; and iii) judicial economy. Defendant bases its argument herein on the doctrine that courts can decline to exercise jurisdiction for prudential reasons, even if jurisdiction is otherwise proper. *Trippe Manufacturing Company v. American Power Conversion Corp.*, 46 F.3d 624, 627 (7th Cir.1995). The decision whether to do so rests within the sound discretion of the trial

court. *See Alexander Proudfoot v. Federal Insurance Company,* 860 F.Supp. 541, 542 (N.D.Ill.1994). Accordingly, we will examine defendant's arguments related to this position in the following sections.

With these guidelines in mind regarding the elements that defendant must establish in order to prevail in its motion to dismiss plaintiff's Counts I—V, the court now considers defendant's arguments, seriatim.

### 1. *Count I—Enforceability of the August 4 Agreement*

■ Emery's initial allegation claims that the August 4 agreement, discussed earlier, is enforceable and that, pursuant to said agreement, USPS must timely and in good faith negotiate a new CLIN 1 price for the contract. Defendant counters that, because it has now changed its position and conceded the main factual issues of Count I, to wit, that the August 4 agreement is, indeed, enforceable, the count itself has been rendered moot and, therefore, the court lacks subject matter jurisdiction over it. Initially, defendant had taken the position that said agreement was *not* enforceable.

Defendant's mootness argument is unpersuasive as it has not conclusively shown that the mere statement that it now agrees that the August 4 agreement is enforceable means it is indeed complying with such. In fact, while defendant admits the enforceability and continuing effect of the August 4 agreement, in both the March 30 decision and the April 13, 2000 Statement To Clarify Remarks At Status Conference, defendant has, arguably, failed to act in accordance with said position. For instance, the August 4 agreement states the following regarding the parties' price renegotiations:

c) For Calendar Year ("CY") 1999, the following process will be used to adjust per-piece CLIN 1 prices . . . .
d) Emery will open its books for audit when requested by the USPS. *Emery will submit a pricing adjustment proposal for CY 1999 on or before January 31, 1999.*
e) . . . *The USPS, after auditing Emery's books to the extent it determines necessary, will evaluate the proposal and respond within 45 days of its receipt. Em-*

*ery and the USPS pledge their best efforts to negotiate in good faith to complete negotiations on or before March 31, 1999,* on final CY 1999 CLIN 1 [pricing] adjustments retroactive to January 1, 1999, and resolution of any pending or possible requests or claims for equitable adjustments or other pending or possible claims under the Contract. . . .

(Amended Compl., App. 6, p. 5) (emphasis added). Pursuant to subsection (e), Emery has submitted its pricing proposal on time, but defendant, to date, has neither responded with its own price proposal, nor completed its audit in order to do so.

In fact, despite the above clauses, defendant, in its March 30 decision, states: "[t]hat [the 1998] audit questioned a significant portion of the costs Emery booked for 1998. . . . [i]n view of the wide disparity between your estimated price for CY 1999 and our own analysis, and the outstanding audit issues, the only prudent course is to continue our discussions based on Emery's actual, audited cost experience for that year." (Def't's Mot. To Dismiss, App. p. 4–5). Emery alleges that defendant is taking far too much time to complete its side of the bargaining rationale and is using an improper method of evaluation, to wit, actual costs. Indeed, the facts bear this allegation out as it has now been over a year since March 31, 1999, the date the August 4 agreement specified the parties were supposed to have agreed on the 1999 pricing, and defendant has neither responded with its own pricing proposal, nor completed its audit. Accordingly, the evidence presented to this court indicates, as far as we can tell, that defendant is not complying with the agreement and, as such, is not properly acknowledging its enforceability. The parties should observe, however, that the court is not ruling, at this time, that defendant is in breach of contract.

Additionally, under the mootness doctrine there is no evidence that defendant will not again, in another CO decision or convenient moment, officially refuse to give the August 4 agreement effect. There is no reason for the court to believe, based on what we have seen in all of the pleadings filed, that defendant

will not again return to its former position that the August 4 agreement is not enforceable. Furthermore, there is no evidence that the consequences of defendant's initial actions, in refusing to recognize the enforceability of the August 4 agreement, have been eradicated. *See National Medical Enterprises,* 11 Cl.Ct. at 329. Consequently, defendant has not met its heavy burden of establishing to the court that Count I is truly moot. *Laidlaw,* 120 S.Ct. at 708. Likewise, any argument that may be proffered by defendant asserting that a remedy under this count would be too difficult to fashion is similarly rejected.

When the court views all the evidence presented and construes the allegations in the complaint favorably to Emery, we are left with the firm conviction that, if such facts as seen by the court are indeed proven by plaintiff, it will be entitled to the declaratory relief requested. *Son Broadcasting,* 42 Fed.Cl. at 537. The court holds that Emery has shown, by a preponderance of all the evidence submitted, that we have subject matter jurisdiction over Count I. Thus, as to said count, we deny defendant's motion to dismiss allegedly due to mootness.

### 2. *Count II—Continuing Effect of the August 4 Agreement*

■ Emery alleges in Count II of its amended complaint that defendant is taking the position that Emery's filing of a CDA claim terminates defendant's obligations under the August 4 agreement and that, because of said position, defendant is in material breach. Therefore, according to Emery, defendant is refusing to give the August 4 agreement continuing effect. This count is substantially similar to, and interrelated with, Count I. As such, Emery prays, in its request for declaratory relief, that "the [pricing] redetermination process established in the August 4 agreement has not been terminated by Emery's formal claim based on a redetermined price," and that, accordingly, the August 4 agreement is enforceable and continuing in effect. (Amended Compl. at 28). Defendant, on the other hand, argues that its March 30 decision and Statement To Clarify Remarks At Status Conference un-

equivocally state its position that it is, in fact, giving continuing effect to the August 4 agreement. As such, defendant argues that plaintiff's Count II should, like Count I, be dismissed as moot.

As the filings indicate, it is true that defendant initially took the position that Emery's filed claim obviated defendant's obligation to honor the August 4 agreement. Defendant stated this initial position in a letter to Emery from the CO, dated September 10, 1999, as follows:

> Since ... your September 8 [1999] claim supplanted the pre-claim CLIN 1 price review process established by section 17 [of the August 4 agreement] with the formal claims review process under the Contract Disputes Act, our obligation under section 17 to pay "provisional" price increases has terminated.... CLIN 1 pricing under the ... Contract accordingly reverts after September 8, 1999 to the original terms and conditions of CLIN 1 of that contract, except as we may otherwise agree to settle your presently pending certified claim.

(Amended Compl. App. 1).

It is also true that defendant retracted this position in its CO's March 30 decision and its April 13, 2000 Statement To Clarify Remarks At Status Conference. What is not necessarily true, however, is that defendant, by these two documents, is complying with the August 4 agreement. In fact, as the previous section explained, the evidence shows that defendant is not giving the August 4 agreement its full and continuing effect. Despite defendant's assertions to the contrary, the inordinate amount of time it is taking to respond to plaintiff's pricing proposal indicates USPS is not complying with the spirit and, perhaps, not the letter of the August 4 agreement. While the papers indicate that defendant is not complying with the August 4 agreement, however, we are not holding, at this time, that defendant was or is in breach of contract.

Consequently, defendant's March 30 decision and Statement To Clarify Remarks do not conclusively show that it is complying with the August 4 agreement's pricing requirements and, therefore, defendant's moot-

ness argument as to Count II, similar to Count I, fails. It is appropos, at this point, to utilize the cliché "actions speak louder than words." Here, just because defendant merely states, in the aforesaid documents, that it is giving the August 4 agreement continuing effect does not mean it is indeed doing so. Accordingly, when the court considers all of the evidence as presented by the parties' filings and construes plaintiff's allegations favorably, such indicates that Emery has proven this court's subject matter jurisdiction over Count II by a preponderance of the evidence. As to Count II, we also deny defendant's motion to dismiss allegedly due to mootness.

### 3. Count III—USPS Obligation to Pay the Provisional Rate Increase

 In this count, Emery alleges that USPS is refusing to pay the provisional rate increase as outlined in the August 4 agreement and discussed *supra* at page 465. Under the agreement, this rate was to cover the brief period of time between the signing of the agreement in 1998 and the date a fixed price was mutually agreed upon for CY 1999. As previously mentioned, the fixed price, at the present time, has still not been set by the parties. Furthermore, plaintiff alleges that USPS is recouping prior provisional rate increases, which were over and above the pre-August 4 agreement prices, and that such is being done, in bad faith, because of Emery's filing of a CDA claim.

Defendant, in its motion to dismiss, requests that the court "decline to exercise jurisdiction" over this count for prudential reasons, including: (i) plaintiff has an adequate damages remedy at law; (ii) the court should not unnecessarily interfere with an existing contract; and (iii) judicial efficiency. The court shall briefly address each of these arguments, seriatim.

Defendant does not state whether it is in fact paying the proper provisional rate as required by the August 4 agreement but alludes that it is not doing so because it concedes, in its discussion of the provisional rate, that: "Emery will in the end be paid based upon its actual costs. *To the extent that there is a live controversy,* however,

Emery possesses a fully adequate legal remedy in an action for damages." (Deft's Mot. To Dismiss at 9) (emphasis added).

Furthermore, USPS argues that, "because Emery may file suit to obtain the provisional price increase in the form of damages, declaratory relief is unwarranted." *Id.* The court rejects this argument for the following reasons. Under the 1992 amendment to the Tucker Act, quoted *supra* at 468, terms such as "any claim" and "other non-monetary disputes" obviously indicate Congress' intent to give the statute broad coverage over non-monetary disputes. 28 U.S.C. § 1491(a)(2). This language is distinctly expansive, not restrictive. Clearly, if Congress wanted to restrict declaratory actions to equitable claims that were certain to have no possible chance of a concomitant damages remedy, then it would have used restrictive, not expansive, language in the statute. In such a scenario, Congress would have made it clear that this court should only exercise jurisdiction over equity claims when there was no possibility of a damages claim.

Defendant attempts to argue that, because plaintiff's Count III "will ripen only later this year" into a claim for monetary damages, it would be inappropriate for the court to ever grant the declaratory relief requested. (Deft's Mot. To Dismiss at 9). This position is contradictory to the open-ended language contained in the Tucker Act, quoted above, and, as such, the court rejects defendant's position that we should dismiss Count III because plaintiff may, at some point, have a claim for damages. *See Alliant Techsystems,* 178 F.3d at 1268.

 Additionally, the court does not find at all compelling defendant's argument that we should decline to exercise jurisdiction because of the potential harm of unnecessary interference with the administration of a continuing contract. The contract's execution is far from being free of interference, as both parties are at odds with each other in strenuously attempting to alter and define its parameters. Moreover, it is likely that court action may actually be the only thing that can save the contract.

■ Likewise, the court views defendant's argument that we should decline jurisdiction because of judicial efficiency equally unpersuasive. Considering the scope and nature of the contract here in dispute, it would be folly for the court to dismiss this equity action merely for judicial economy. This is particularly true whereas here the court is fully mindful of the renowned equitable principles that—he who comes into equity must come with clean hands; and defendant, who asks us to dismiss this count in equity, is certainly not of clean hands. *See, e.g., Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 244–45, 54 S.Ct. 146, 78 L.Ed. 293 (1933). Consequently, the court rejects defendant's position that we should decline to exercise jurisdiction for prudential reasons and holds that plaintiff has adequately established this court's subject matter jurisdiction over Count III. Defendant's motion to dismiss Count III for prudential reasons is, therefore, denied.

### 4. Count IV—USPS Return to Volume Variation Pricing

■ Under this count, Emery alleges that USPS has, in contravention of the August 4 agreement, applied volume variation pricing instead of the provisional rate as discussed in the prior section and that such is a material/anticipatory breach of the agreement. This count is interrelated with Count III and should be viewed as the 'flip-side' of said count. In other words, plaintiff alleges that USPS should be ordered to apply the provisional pricing as outlined in the August 4 agreement (Count III), instead of applying the pre-August 4 agreement's volume variation pricing, which USPS is now doing in breach of the contract (Count IV).

Defendant concedes that its March 30 decision and its Statement To Clarify Remarks At Status Conference do not address this issue directly but requests the court, nonetheless, to decline to exercise subject matter jurisdiction for the following prudential reasons, which mirror those of Count III:(i) plaintiff has an adequate damages remedy; (ii) the court should not unnecessarily interfere with an existing contract; and (iii) judicial efficiency.

As in Count III, defendant argues that, because "the contracting officer has determined that Emery will, in the end, recover its full, allowable actual costs," Count IV should be dismissed as plaintiff has an adequate damages remedy at law (Deft's Mot. To Dismiss at 8). As mentioned earlier, defendant does not appear to be meeting its obligation to pay this provisional rate as required under the August 4 agreement and, accordingly, plaintiff's declaratory request in Count IV is, indeed, viable. For the same reasons discussed in the prior section, the court rejects defendant's damages argument as applied to this interrelated count. Simply because plaintiff may have an adequate money damages remedy, at some point, does not necessarily mean, on these facts, that the court should dismiss the current declaratory relief request, and we decline to do so. *See Alliant Techsystems,* 178 F.3d at 1268. Defendant has not shown an adequate reason why this court should decline to exercise jurisdiction simply because plaintiff may have a future damages claim.

Likewise, as in Count III, the court finds unpersuasive defendant's arguments for dismissal because of the possible harm in unnecessarily interfering with an existing contract and for judicial efficiency. The reasons supporting the court's ruling as to these two arguments are more fully explained in the prior section. Considering all of the above, the court holds that Emery has established our subject matter jurisdiction by a preponderance of the evidence and, accordingly, we deny defendant's motion to dismiss Count IV.

### 5. Count V—Interpretation of the Price Redetermination Process

■ In Count V of its amended complaint, Emery alleges that defendant has taken the position that, in order for the pricing structure of the August 4 agreement to become efficacious, Emery must show that: (a) such is necessitated by Emery's losses and (b) those losses are the result of USPS's changes to the contract. Additionally, plaintiff claims that this position is a material breach and, as such, the court should: 1) declare USPS's obligations under the August

4 agreement and 2) declare that Emery has a right to cease performance.

Defendant counters that it has already conceded the above issue in its March 30 decision and its Statement To Clarify Remarks At Status Conference and that, therefore, plaintiff's request is moot and should be dismissed. Specifically, defendant states, with regard to plaintiff's dispute over having to show losses caused by USPS, that "[t]hose issues are also moot because the contracting officer has determined that Emery is entitled to a *fair and reasonable price* for CLIN 1, based upon its *actual* costs" (Deft's Mot. To Dismiss at 7) (emphasis added).

The court has reviewed the March 30 decision and notes that defendant has, in fact, conceded that it *intends* to allow plaintiff a reasonable profit on the contract as per the August 4 agreement. It does not follow, however, that defendant has committed itself to do so because it has not even completed its price redetermination for CY 1999. As explained earlier, defendant is over a year late in responding to plaintiff's price proposal. Moreover, proper justification for why defendant has not completed its end of the pricing redetermination agreement at the present time is not supported by the record thus far. Defendant merely states that its audit of Emery's books, which is called for in the August 4 agreement, has not yet been completed. While the court is not holding that such is being done in bad faith or in breach of contract, the totality of the evidence indicates that defendant is taking an unreasonable amount of time to complete its audit, clearly outside of the timescale as envisioned by the August 4 agreement.

Accordingly, defendant's bare statements, in its March 30 decision and Statement to Clarify Remarks At Status Conference, that it will comply with the August 4 agreement's price redetermination process does not mean it is actually doing so. As such, plaintiff's request for declaratory relief requiring defendant to comply with said process is anything but moot. Therefore, similar to Counts I and II, defendant has not met its heavy burden in showing that Count V is moot. Considering all of the above, this court holds that plaintiff has shown, by a preponderance

of the evidence, that this court retains subject matter jurisdiction over Count V. Consequently, the court denies defendant's motion to dismiss Count V.

## II. THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

Pursuant to RCFC 56(c), plaintiff seeks summary judgment on all six counts contained in its first amended complaint. Defendant, under the same rule, seeks summary judgment on Count VI only, *i.e.,* continued performance. RCFC 56(c) is modeled after Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.), both providing that: "[t]he judgment sought shall be rendered forthwith if the pleadings, [and all other filings] ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56.

In order for this court to grant either party's motion for summary judgment, the court, of course, must find that there are no genuine issues of material fact and that the prevailing moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine dispute" is one in which a reasonable jury, or in this case a reasonable judge, could return a judgment for the nonmovant. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to show that (1) there is no genuine dispute as to any material fact and (2) it would be entitled to a directed verdict at trial. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Any doubt as to factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences run. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Summary disposition is appropriate only if there is no genuine dispute over a *material* fact. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A material fact is one that might affect the outcome of the suit under the

governing substantive law. *Id.* Disputes over facts which would not determine the outcome are immaterial and, therefore, will not preclude the entry of summary judgment. *Id.; Lane Bryant, Inc. v. United States*, 35 F.3d 1570 (Fed.Cir.1994).

Initially, the burden is on the moving party to produce adequate evidence showing that there is no genuine issue of material fact supporting the non-movant's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. This burden may be discharged, and then shifted, if the moving party demonstrates that there is an absence of any evidence to support the nonmoving party's case. *Id.* If the moving party makes such a showing, the nonmoving party must, if it desires to avoid an adverse judgment, demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *Donnie Price v. United States*, 46 Fed.Cl. 640, 645 (2000).

In reaching a decision on summary judgment, the court is not to weigh the evidence, nor make credibility assessments, nor seek the absolute truth of the matter. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The role of the judge is simply to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. When deciding a motion for summary judgment, the judge must determine whether the evidence presents a dispute or contrary positions among the parties sufficient to require submission to a factfinder, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Id.* at 251–52, 106 S.Ct. 2505. Pursuant to RCFC 56, a motion for summary judgment may be decided by the judge based upon the totality of documentary evidence, in addition to the pleadings, on file with the court. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. There is no requirement that the trial judge make actual findings of fact, just simply a determination of whether or not there are genuine issues of material fact in existence. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505.

Summary judgment is appropriate here at bar because the sole dispute concerns the interpretation of a government contract, which is a question of law. *See Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir.1996). Additionally, because both parties moved for summary judgment as to Count VI, each motion under said count was judged independently by the court. *Donnie Price*, 46 Fed.Cl. at 645. With these above guidelines in mind concerning motions for summary judgment, the court will now consider both parties' motions as to each of plaintiff's six counts in the aggregate and in the following order: (1) Counts I, II, and V; (2) Counts III and IV; and (3) Count VI.

1. *Counts I. II. and V; Enforceability, Continuing Effect, and Interpretation of the Price Redetermination Process of the August 4 Agreement*

Emery's allegations, under these three counts, claim, most importantly, that the August 4 agreement is enforceable, continuing in effect, and that, pursuant to said agreement, USPS must timely and in good faith negotiate a new CLIN 1 price for the contract. Also, Emery alleges that defendant has taken the position, in bad faith, that Emery's filing of a CDA claim terminates its obligations under the August 4 agreement and that, in order for the pricing structure of the August 4 agreement to become efficacious, Emery must show: (i) such is necessitated by Emery's losses and (ii) those losses are the result of USPS's changes to the contract. Finally, Emery alleges that, because defendant has taken these positions, it is in breach of contract.

In view thereof, Emery requests the following declaratory judgments under these three counts: (a) that the provisions of the August 4 agreement are valid and enforceable; (b) that the pricing redetermination process established in the August 4 agreement has not been terminated by Emery's formal claim based on a redetermined price; (c) that USPS is not entitled to require Emery, as a condition of a negotiated CLIN 1 rate increase, to show losses as a result of USPS changes to the contract; (d) that USPS is required to respond to Emery's CLIN 1 pricing proposals under the August 4 agreement; (e) that USPS is obligated to negotiate in good faith to complete negotia-

tions for the CY 1999 CLIN 1 rate, and to use its best efforts to do so; (f) that USPS actions as reflected in the Amended Complaint are breaches of the contract; and (g) that Emery may elect to cancel the contract and cease performance.

The relevant portion of the August 4 agreement, under these three counts, states the following regarding the parties' price renegotiations:

c) For Calendar Year ("CY") 1999, the following process will be used to adjust per-piece CLIN 1 prices . . . .

d) Emery will open its books for audit when requested by the USPS. Emery will submit a pricing adjustment proposal for CY 1999 on or before January 31, 1999.

e) . . . The USPS, after auditing Emery's books to the extent it determines necessary, will evaluate the proposal and respond within 45 days of its receipt. Emery and the USPS pledge their best efforts to negotiate in good faith to complete negotiations on or before March 31, 1999, on final CY 1999 CLIN 1 [pricing] adjustments retroactive to January 1, 1999, and resolution of any pending or possible requests or claims for equitable adjustments or other pending or possible claims under the Contract. During this process, the USPS will pay Emery a USPS-determined provisional per-piece CLIN 1 rate increase in an amount to be determined in the USPS's sole discretion. . . .

\* \* \* \* \* \*

j) The same process will be followed to adjust CLIN 1 prices and resolve other claims and disputes for CY 2000. The USPS agrees to review CLIN 1 pricing and possible or pending Contract claims or disputes in subsequent years and to follow the same process of adjusting the CLIN 1 price and resolving claims and disputes if necessary.

(Amended Compl., App. 6, p. 5).

As stated earlier, the filings indicate that defendant initially took the position that Emery's filed CDA claim obviated defendant's obligation to honor the August 4 agreement. Such was stated to Emery in a September 10, 1999 letter from USPS's CO. *See discus-*

*sion supra* at 471. Defendant has retracted this position, particularly in its March 30 decision and Statement To Clarify Remarks At Status Conference. This does not mean, however, that defendant is fully complying with all of its obligations under the August 4 agreement, and, indeed, it appears that it may not.

As previously explained, Emery timely submitted its pricing proposal on February 1, 1999, but defendant, to date, has neither responded with its own price proposal nor completed its audit in order to do so. Emery claims that defendant is taking too much time to complete its side of the bargaining. Indeed, Emery appears correct as it has now been almost a year and a half since March 31, 1999, the date the parties were supposed to have agreed on the 1999 pricing. Emery alleges that defendant is operating in bad faith and in breach of contract. Defendant's position, on the other hand, is that, because it is concerned with what it is seeing in its audit of Emery's books, plaintiff's pricing proposal must be erroneous. The court, however, is unable to determine, at this time, whether defendant's current position is justified under the August 4 agreement. Consequently, we are not deciding, presently in this opinion, whether or not defendant was or is in breach of contract for any of its alleged actions and if any of such actions were in bad faith.

Other than the breach of contract allegation, defendant has conceded the main factual issues of Counts I, II, and V in its March 30 decision and its April 13, 2000 Statement To Clarify Remarks At Status Conference. In the latter document, defendant states:

. . . In accord with the contracting officer's March 30, 2000 final decision, we concede the factual allegations contained in counts I, II, and V and the legal conclusions that the August 4, 1998 agreement is enforceable, is of continuing effect, and does not require plaintiff to justify increases in its Priority Mail price by reference to (a) financial losses by plaintiff or (b) changes in the performance terms of the contract. We understood the discussions during the conference, including the remarks by

plaintiff's counsel, to be consistent with the scope of our admissions set forth above.

As we established in our pending dispositive motion [to dismiss] . . . there is no material breach. . . .

(Defendant's Statement To Clarify Remarks At Status Conference at 2).

Summary judgment is appropriate when there are no genuine issues of material fact supporting the nonmovant's case and the movant is entitled to judgment as a matter of law. *See discussion supra* at 474–75. As such, and in accordance with the above admissions and understanding contained in this section, the court partially grants plaintiff's motion for summary judgment on Counts I, II, and V, and orders the following declaratory relief as requested by Emery:

(A) the provisions of the August 4 agreement are valid, enforceable, and continuing in effect;

(B) the pricing redetermination provisions established in the August 4 agreement have not been terminated by any existing CDA claim made by Emery;

(C) Emery does not have to demonstrate losses caused by USPS as a condition of a negotiated CLIN 1 rate increase;

(D) USPS must respond to Emery's pricing proposal of February 1, 1999, under the parameters set by the August 4 agreement, within forty-five (45) days of this opinion, and must timely respond to all future pricing proposals from Emery as outlined in the August 4 agreement; and

(E) USPS must hereafter negotiate timely and in good faith to complete the pricing redeterminations under the August 4 agreement for CY 1999 and all applicable years beyond.

Finally, under Counts I, II, and V, plaintiff requests this court to declare that it has a right to cease performance, which defendant opposes. This request is repeated in Count VI, which contains plaintiff's main argument supporting its position. Accordingly, the discussion of continued performance is contained in part 3, *infra*, the section addressing Count VI. Also, plaintiff urges the court to declare that defendant's actions constitute breaches of the contract. This is strictly a

legal issue on which this court deems that a ruling, at this posture, is premature. Thus, we decline to so rule at this stage.

2. *Counts III and IV: USPS Obligation to Pay the Provisional Rate Increase and End Volume Variation Pricing*

In these two counts, Emery alleges that USPS is refusing to pay the provisional rate increase as outlined in the August 4 agreement and has, in contravention of said agreement, applied volume variation pricing instead. Under the agreement, the provisional rate was to cover the brief period of time between the signing of the agreement in 1998 and the date a fixed price was mutually agreed upon for CY 1999. As previously mentioned, the fixed rate, at the present time, has still not been decided. Moreover, plaintiff alleges that, because it filed a CDA claim, USPS is recouping prior provisional rate increases which were over and above the pre-August 4 agreement prices. Emery alleges that these actions taken by USPS are in material breach of the contract.

Accordingly, Emery requests the following declaratory judgment rulings, under Counts III and IV, that: (a) USPS remains obligated to pay Emery reasonable provisional rate increases, as outlined in the August 4 agreement, until a redetermined fixed rate is set by negotiation or order; (b) USPS is not entitled to recoup its prior payments of the CY 1999 provisional rate increase; (c) USPS is not entitled to resume volume variation pricing, as outlined in the original contract, merely because Emery filed a claim under the CDA related to the redetermination process; (d) USPS actions, as reflected in the Amended Complaint, are breaches of the contract; and (e) Emery may elect to cancel the contract and cease performance.

The relevant portion of the August 4 agreement, relating to these two counts, states the following regarding the provisional rate:

16. ***Volume Variation Pricing*** The volume-variation pricing of the Contract's Section A is eliminated, and the 95–105% volume price of said Section A is substituted, for all CLIN 1 service . . . .

### 17. *Increase in Per–Piece Price*

\* \* \* \* \* \*

(e) ... During this process, the USPS will pay Emery a USPS-determined provisional per-piece CLIN 1 rate increase in an amount to be determined in the USPS's sole discretion. The USPS will inform Emery, in writing, of the amount of this provisional per piece rate CLIN 1 increase on or before December 31, 1998.

(Amended Compl., App. 6, p. 5).

As previously discussed, given this record, defendant does not appear to be paying *any* provisional rate, as required by the August 4 agreement, because of its statement: "Emery will in the end be paid based upon its actual costs. To the extent that there is a live controversy [about our obligation to pay a provisional rate], however, Emery possesses a fully adequate legal remedy in an action for damages." (Deft's Mot. To Dismiss at 9). Defendant informed Emery that it was ending its provisional pricing under the August 4 agreement, because of Emery's claim, in a September 10, 1999 letter, stating, "... our obligation under section 17 [of the August 4 agreement] to pay the 'provisional' price increase has terminated." (Amended Compl. App. 1). Emery alleges that defendant has returned to its pre-August 4 agreement's payment structure, including volume variation pricing, which is in violation of said agreement.

While defendant, for the most part, has conceded that it is not paying the provisional rate as outlined in the August 4 agreement, it is not, however, admitting material breach on its behalf. Defendant's current position on this issue, as outlined by the March 30 decision and its other filings, is that, because Emery will *eventually* be paid the proper rate and will receive all of the money it is entitled to, no provisional rate is necessary. The court rejects this hospitable position as the March 30 decision does not obviate defendant's obligation to pay some kind of provisional rate, which was called for under the August 4 agreement. Again, and notwithstanding the foregoing, the court is not ruling, at this time, that defendant is in breach of contract for neglecting to do so.

As explained in the prior section, defendant unequivocally admits that the August 4 agreement is enforceable and continuing in effect. That efficacious agreement, as quoted above, provides for a provisional rate to be paid by USPS, with respect to which USPS has conceded that it must pay some kind of provisional rate. Consequently, while the court is not ruling on the material breach issue, we do grant plaintiff's motion for summary judgment on these two counts to the extent of the following declaratory rulings:

(A) USPS is obligated to pay Emery reasonable and material provisional rate increases, as outlined in the August 4 agreement, until such time as the parties have renegotiated the fixed pricing rate under said agreement;

(B) USPS is not entitled to recoup its prior payments of the CY 1999 provisional rate increases; and

(C) USPS is not entitled to resume volume variation pricing, as outlined in the original contract, unless both parties agree to such act.

Additionally, under Counts III and IV, plaintiff requests this court to declare that it has a right to cease performance, which defendant opposes. This request is repeated in Count VI, which contains plaintiff's main argument supporting its position. The following section, which contains the main discussion concerning continued performance, will address this issue.

### 3. *Count VI—Emery's Right to Cancel the Contract and Stop Work*

Count VI of Emery's amended complaint alleges that, because of USPS's material breaches, it has a right to cease performance of the contract. Additionally, Emery argues that "the Claims and Disputes clause incorporated into the contract does not require Emery to continue working after a material breach by USPS, because such breach claims are not disputes 'arising under' the contract." (Amended Compl. at 27). Accordingly, Emery requests a summary judgment order, from this court, permitting it to cease performance under the contract.

Defendant counters that "the bulk of the 'breaches' alleged in the complaint have been *cured* (if they ever existed) by the contracting officer's March 30 decision, which acknowledged that the price redetermination process for CLIN 1 should go forward." (Deft's Mot. To Dismiss at 10) (emphasis in original). Any breaches not cured, defendant continues, are not material. Finally, defendant contends that any material breaches for which it is liable are disputes "arising under" the contract and that, therefore, the disputes clause of the contract requires Emery to continue working until the dispute is resolved. If the court determines that USPS did, indeed, breach the contract, then defendant contends that Emery has waived any such right it had to cease performance when it continued to perform after it filed its first claim against USPS under the contract. Therefore, under all of the alternative theories above, defendant requests a summary judgment order that Emery be required to continue work performance. In this section, plaintiff's motion for summary judgment will be discussed first, followed by the discussion of defendant's motion.

As explained previously, the court is not ruling, at this time, whether defendant is currently, or was in the past, in material breach of contract. It is true that defendant has admitted a number of the issues presented in plaintiff's six-count amended complaint, which would arguably support the contention that defendant breached the August 4 agreement prior to the March 30, 2000 decision's "cures." For instance, defendant admits that, prior to March 30, 2000, it took the indefensible positions that the August 4 agreement was unenforceable and that Emery's filed claim obviated defendant's obligation to honor the agreement. Defendant then retracted these positions in the March 30 decision and confirmed such in its April 13, 2000 Statement To Clarify Remarks At Status Conference. Furthermore, as previously discussed, some of the evidence presented in this case indicates that defendant is currently not complying with said agreement. Defendant has not, however, conceded that it did, in fact, breach the agreement at any time.

The court holds that the totality of the evidence presented falls short of proving that defendant irrefutably breached the contract and, therefore, we rule that plaintiff is not entitled to cease performance. As such, the court denies plaintiff's request for summary judgment on this issue, particularly in view of the fact that plaintiff may have a viable damages claim in the future.

■ Regarding defendant's motion for summary judgment, the contract contains a disputes clause, which states: "a. This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. § 601–613) ('the Act')," and "b. Except as provided in the Act, all disputes *arising under* or relating to this contract must be resolved under this clause." (Amended Compl. App. 4) (emphasis added). Emery argues that defendant's breaches are of such seriousness as to be a complete repudiation of the contract as a whole and, therefore, the current dispute is not one which "arises under" the contract. Defendant counters that the dispute is basically over the *timing* of payments and, therefore, it is one which falls squarely ("arises") under the contract.

■ "Of course, the government may not, through a contracting officer's decision, impose obligations on a contractor far exceeding any contemplated by their contract. If the government orders a 'drastic modification' in the performance [or payment terms] required by the contract, the order is considered a 'cardinal change' that constitutes a material breach of the contract.... Such a material breach has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause." *Alliant Techsystems,* 178 F.3d at 1276 (citations omitted).

Considering that the court has not found, at this time, that defendant's actions are in breach of contract and that we are ordering USPS to comply with a number of provisions as set forth in the August 4 agreement, any disputes between the parties are, at this point, clearly ones which would fall under the disputes clause of the contract. Moreover, the language of the disputes clause contained in the contract and quoted above is unequivocal in its direction to Emery to continue

performance under the type of scenario that is presently before us. As such, the court hereby orders Emery to continue performing the contract as set out by said contract provisions and as substantially amended by the August 4 agreement.

### CONCLUSION

As explained in the body of this opinion, defendant's motion to dismiss Counts I—V is hereby DENIED. Plaintiff's motion for summary judgment on Counts I—V is hereby GRANTED, to the extent as indicated in each relevant section above, because of defendant's admissions, the facts presented to the court, and controlling legal precedent. As to both parties' cross-motions for summary judgment on Count VI, the court hereby DENIES plaintiff's motion and GRANTS defendant's motion. Accordingly, because the court has ruled on these motions in their entirety, plaintiff's request to present additional affidavits/evidence pursuant to RCFC 56(g), in order to support its motion for summary judgment, is hereby DENIED.

Given all of the foregoing, and because this opinion adjudicates the entirety of plaintiff's amended complaint and the parties' respective dispositive motions, the Clerk shall enter judgment accordingly. No costs.

IT IS SO ORDERED.